UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

- - - - - - - - - - - - - -

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:08-CR-47 |
| Plaintiff, | |
| v. | Hon. Paul L. Maloney<br>United States District Judge |
| FRANK BRIAN AMBROSE, | |
| Defendant. | |
| _____/ | |

PLEA AGREEMENT

This constitutes the plea agreement between FRANK BRIAN AMBROSE and the U.S. Attorney's Offices for the Western District of Michigan, the Eastern District of Michigan, and the Southern District of Indiana. The terms of the agreement are as follows:

1. <u>Defendant Agrees to Plead Guilty.</u> The Defendant agrees to plead guilty to Count 1 of the Indictment, charging him with conspiring to commit arson in violation of Title 18, United States Code, Section 844(n).

2. <u>Defendant Understands the Crime</u>. In order for Defendant to be guilty of violating Title 18, United States Code, Section 844(n), the following must be true: (1) the Defendant must have knowingly and willfully agreed with one or more persons to maliciously damage or destroy, or to attempt to damage or destroy, by means of fire, a building or other personal property; (2) the building or personal property must have

been owned by an institution receiving Federal financial assistance, or have been used in interstate or foreign commerce or in an activity affecting such commerce; (3) thereafter, and in furtherance of the agreement, one or more persons who were party to the agreement must have committed an overt act, that is, an act that constituted a substantial step towards the commission of one or more of the crimes contemplated in the agreement. The Defendant is pleading guilty because he is guilty of the charge described above.

3. <u>The Defendant Understands the Penalties</u>. The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 844(n) is the following: imprisonment for not less than five years nor more than twenty years; supervised release for any term of years or life; a fine of $250,000; and a mandatory special assessment of $100. The Defendant agrees to pay the special assessment at or before the time of sentencing unless the Defendant affirmatively demonstrates to the Court that he lacks the ability to pay.

4. <u>Restitution</u>. The Defendant understands that he will be required to pay full restitution to the victims of the offenses that are detailed in paragraph 5 of this agreement. The Defendant expressly agrees that the offense charged in Count 1 was part of a pattern of criminal activity that caused significant financial loss in addition to the losses caused by the charged offense. Accordingly, and pursuant to Title 18, United States Code, Sections 3663(a)(1)(A) and (3), the Defendant agrees that his restitution obligation should include losses suffered by parties other than the victims of the offense charged in Count 1. The parties currently believe that the applicable

amount of restitution is $3,714,536.00, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

5. <u>Factual Basis of Guilt and Stipulation of Relevant Facts</u>. The Defendant and the United States agree and stipulate to the following statement of facts which need not be proven at the time of the plea or sentencing:

A. On an unknown date prior to December 31, 1999, Marie Mason obtained and reviewed printed information that had been gathered by an acquaintance of hers regarding plant genetic research that was being funded by the United States Government and that was being conducted at Michigan State University (MSU) in East Lansing, Michigan, by employees of that institution.

B. On or about December 30, 1999, Frank Ambrose traveled by car through Detroit, Michigan, where he picked up Aren Burthwick, Stephanie Fultz, *nee* Dzagulones, and a fifth person before continuing on to Empire, Michigan, where the group met Marie Mason.

C. While in Empire, Michigan, the group discussed committing an arson in order to destroy plant genetic research and the facility where it was being conducted, and also discussed the fact that fully accomplishing the objective would require the participation of all members of the group. After all five agreed to commit the arson, they discussed the specific roles that each would play in destroying records of, and papers related to, plant genetic research that they believed was being conducted at Agriculture Hall on the campus of MSU, as well as plants being grown in a nearby greenhouse or greenhouses. Before the time came to depart for MSU, however, Burthwick, Fultz, and the fifth person decided

that not enough planning had gone into the attack and that they would remain in Empire because they were too afraid of being caught. Ambrose and Mason, however, made clear that they were still going to carry out their part of the attack and that they would return when they had accomplished the arson. Burthwick, Fultz, and the fifth person did not take any affirmative step to renounce or defeat the purpose of the conspiracy, did not disassociate themselves from the conspiracy, and remained behind in Empire until Mason and Ambrose returned.

D.   In the early evening hours of December 31, 1999, Mason and Ambrose traveled by car from Empire to the campus of MSU in East Lansing, Michigan, and located Agriculture Hall. They entered the building and located the third floor office spaces they had previously identified as the place where records of, and papers related to, plant genetic research were maintained. Ambrose then left the building to purchase gasoline and other materials to use in the arson, while Mason remained in the largely uninhabited building.

E.   When Ambrose returned to Agriculture Hall, Mason let him into the locked building. The two returned to the third floor office spaces where they opened file cabinets, poured gasoline on the files and various computer hard-drives, and on the floor. Ambrose fashioned a crude fuse using rolled up paper and lit it, accidentally causing gasoline fumes that had accumulated in the enclosed space to ignite.

F.   The resulting explosion burned the portion of Mason's hair that protruded beneath the dark stocking cap that she was wearing, and prevented her from

4

finishing the message "No GMO" that she had begun to spray-paint on an interior wall. The two then left the building and returned to Empire, where they met Burthwick, Fultz, and the fifth person. They told the three that the arson had been a success but that there had been an explosion and that Mason's hair had been burned. After Burthwick, Fultz and the fifth person confirmed that neither Ambrose nor Mason had been injured, Fultz agreed to cut Mason's hair short to remove the burned portion.

G.   Ambrose, Mason, and the others were motivated to commit the arson by their belief that genetic plant research was harmful to the natural environment and that, by burning a facility involved in such research, they could intimidate, coerce, and deter government agencies, private organizations, and the general public from conducting or supporting such research. Accordingly, the intended "No GMO" message was shorthand for "No Genetically Modified Organisms."

H.   The fire at Agriculture Hall caused property damage in excess of $1.1 million dollars. It also required responses by the fire departments of three adjacent jurisdictions, and numerous personnel of those departments were at substantial risk of physical injury while they performed their duties.

I.   The research in question was being conducted by MSU using funding provided by the United States Government, specifically, the U.S. Agency for International Development (US AID). At the time, US AID had funded the research for ten years at approximately $2 million dollars per year. The MSU research also involved interstate and international commerce because those conducting it included persons from States outside Michigan and countries

outside the United States; because the result of the research was intended to assist populations in countries outside the United States; and because MSU is an academic institution that draws significant numbers of students and employees from outside Michigan and outside the United States.

J.  The next day, on January 1, 2000, Mason, Ambrose, Burthwick, Fultz, and the fifth person observed commercial logging equipment that included a "John Deere" brand Hydro-Ax Shear and a commercial flatbed trailer parked off to the side of a road in or near Mesick, Michigan. The five decided to destroy the equipment by fire and drove to a nearby gas station and convenience store to purchase materials with which to burn the equipment. While Ambrose pumped gasoline into a container, Mason, Fultz and Burthwick entered the store and purchased charcoal, firewood, and a disposable lighter.

K.  The group then returned to the logging equipment and, using the flammable materials just purchased, set fire to it. Using a can of black spray-paint, Fultz painted the letters "ELF" and the words "Log in Hell" and "Go Log in Hell" on the flat-bed trailer. The resulting fire caused property damage of approximately $18,000 dollars

L.  Ambrose, Mason, and the others were motivated to commit the arson by their belief that commercial logging is harmful to the natural environment and that, by burning property used in that industry, they could intimidate, coerce, and deter government agencies, private organizations, and the general public from conducting or supporting it.

M.  The logging equipment was used in interstate commerce, and in an

6

activity affecting interstate commerce, because it was designed and used for harvesting trees for the purpose of reducing them to commercial lumber, and because such lumber is then used in interstate commerce. In particular, at the time it was destroyed, the equipment in question was under contract to a logging company that was harvesting timber for processing at the Pine Tech Lumber Mill in Lake City, Michigan. Pine Tech products were, and are, sold and marketed by the Pine Forest Lumber Company in Plymouth, Michigan, a company that sells and ships lumber to wholesale lumber distributors, office wholesalers, landscaping suppliers, furniture manufacturers, and other businesses in interstate commerce. Specifically, Pine Tech lumber is distributed by Pine Forest Lumber to businesses in other Midwestern States, in Mid-Atlantic States, and in Canada.

N.     The ELF was, and remains, a loosely organized movement of individuals who are committed to the cessation of commercial, research, and other activities that its adherents consider harmful to the natural environment. ELF espouses a philosophy of what its adherents refer to as "direct action" and "monkey-wrenching," terms that denote acts of politically-motivated violence designed to intimidate or coerce segments of society, including the general civilian population, private business, and government, into changing their attitudes about environmental issues and/or ceasing activities considered by the movement to have a negative impact on the natural environment. ELF direct actions include acts that violate the criminal laws of the United States or of individual States and

that are dangerous to human life. Arson is one of the most frequently employed forms of ELF direct action and monkey-wrenching.

O.  Both the MSU and Mesick arsons were subsequently claimed by, and advertised as, ELF direct actions on the movement's Internet website.

P.  Defendant admits that, in addition to the MSU and Mesick arsons, he participated in the following acts of property destruction on behalf of ELF:

(i)  Aug. 7, 1999 - Escanaba, MI - (arson) two power boats; loss $9,436.

(ii)  Aug. 22, 1999 - Bloomington, IN - (arson) Deer Park construction site; loss $95,000.

(iii)  Nov. 2, 1999 - Bloomington, IN - (vandalism) logging equipment; loss $55,000.

(iv)  Jan. 23, 2000 - Bloomington, IN - (arson) Sterling Woods Development; loss $200,000.

(v)  Apr. 30, 2000 - Bloomington, IN - (vandalism) Crider & Crider Equipment; loss $75,000.

(vi)  Jun. 26, 2000 - Bloomington, IN - (tree-spiking) Morgan-Monroe State Park; loss $5,500.

(vii)  Jun. 26, 2000 - Bloomington, IN - (tree-spiking) Yellowwood State Forest; loss $1,600.

(viii)  Jul. 2, 2000 - North Vernon, IN - (arson-vandalism) Rose Acre Farm; loss $100,000.

(ix)  Oct. 18, 2000 - Shoals, IN - (vandalism) Martin State Park; loss $55,000.

(x) Mar. 21, 2003 - Superior Township, MI - (arson) Mystic Forest; loss $1,000,000.

(xi) Jun. 4, 2003 - Macomb County, MI - (arson) Willow Ridge; loss $1,000,000.

Q. Based on the foregoing, and consistent with Paragraph 4, Defendant stipulates and admits that the property destruction attributable to his pattern of criminal activity on behalf of ELF exceeded $2,500,000 but was less than $7,000,0000, and that the offense charged in Count 1 involved, or was intended to promote, a Federal crime of terrorism as that term is defined in 18 U.S.C. § 2332b(g)(5).

6. <u>The Sentencing Guidelines</u>. The Defendant understands that, although the United States Sentencing Guidelines (the "Guidelines") are not mandatory, the Court must consult the Guidelines and take them into account when sentencing the Defendant. The Defendant understands that the Court, with the aid of the presentence report, will determine the facts and calculations relevant to sentencing. The Defendant understands that the Defendant and the Defendant's attorney will have the opportunity to review the presentence report and to make objections, suggestions, and recommendations concerning the calculation of the Guideline range and the sentence to be imposed. The Defendant further understands that the Court shall make the final determination of the Guideline range that applies in this case, and may impose a sentence within, above, or below the Guideline range, subject to the statutory maximum and minimum penalties described elsewhere in this Agreement. The Defendant further

understands that disagreement with the Guideline range or sentence shall not constitute a basis for withdrawal of the plea.

7. <u>Cooperation in Criminal Investigations</u>. The Defendant agrees to fully cooperate with the Federal Bureau of Investigation and the signatory U.S. Attorney's Offices in their investigation of the charges contained in the Indictment as well as the investigation of crimes over which they have actual or apparent jurisdiction. The Defendant's cooperation will consist of all steps needed to uncover and prosecute such crimes, including, but not limited to: providing investigators with a full, complete and truthful statement concerning the Defendant's knowledge of any and all criminal activity of which he is aware; truthfully answering investigators' questions; meeting with prosecutors before testifying; truthfully testifying before grand juries and in any court proceedings; and providing all relevant tangible evidence in the Defendant's possession or under the Defendant's control, including, but not limited to, objects, documents, and photographs. The Defendant's obligation to cooperate under this paragraph is an affirmative one and includes the obligation to voluntarily come forward with any and all information which the Defendant should reasonably know will assist in the investigation of other criminal activity. The Defendant will neither commit nor assist others in the commission of any criminal offense during the course of his cooperation with the United States. The Defendant will submit to polygraph examinations upon request. The Defendant's obligation under this paragraph is a continuing one, and shall continue after sentencing until all investigations and prosecutions in which the Defendant's cooperation is deemed relevant by the U.S. Attorney's Office have been completed.

8. <u>Waiver of Constitutional Rights.</u>   By pleading guilty, the Defendant gives up the right to persist in a plea of not guilty and the right to a speedy and public trial by jury or by the Court. As a result of the Defendant's guilty plea, there will be no trial. At any trial, whether by jury or by the Court, the Defendant would have had the following rights:

   a. The right to the assistance of counsel, including, if the Defendant could not afford an attorney, the right to have the Court appoint an attorney to represent the Defendant.

   b. The right to be presumed innocent and to have the burden of proof placed on the Government to prove the Defendant guilty beyond a reasonable doubt.

   c. The right to confront and cross-examine witnesses against the Defendant.

   d. The right, if the Defendant wished, to testify on the Defendant's own behalf and present evidence in opposition to the charges, including the right to call witnesses and to subpoena those witnesses to testify.

   e. The right not to be compelled to testify, and, if the Defendant chose not to testify or present evidence, to have that choice not be used against the Defendant.

By pleading guilty, the Defendant also gives up any and all rights to pursue any affirmative defenses, including but not limited to alibi, statute-of-limitations, duress, entrapment, coercion, and insanity. The Defendant also gives up the right to raise any Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

9. <u>Waiver of Appeal and Collateral Attack.</u> The Defendant understands that

the law affords him the right to appeal the sentence imposed. Acknowledging this, the Defendant knowingly waives the right to appeal a sentence that is within the applicable guideline range as determined by the Court at sentencing and the manner in which the sentence was determined on the grounds set forth in 18 U.S.C. § 3742 or any ground whatever, in exchange for the concessions made by the United States Attorney's Office in this plea agreement, except that the Defendant may appeal on grounds, preserved at sentencing, that the Court incorrectly determined the guideline range. The Defendant also waives the right to challenge such a sentence and the manner in which it was determined in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, § 2255. This agreement does not affect in any way the right of the U.S. Attorney's Office to appeal the sentence imposed by the Court.

10. <u>The United States Attorney's Office Agrees</u>: The U.S. Attorney's Office agrees not to oppose the Defendant's request for a two-level reduction of his offense level for acceptance of responsibility under §3E1.1(a) of the Sentencing Guidelines. However, the U.S. Attorney's Office reserves the right to object to Defendant's request if it subsequently learns of conduct by the Defendant that is inconsistent with the criteria set forth in the Commentary to Section 3E1.1. Should the Court grant a two-level reduction as provided herein, the Government states that the Defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying it of his intention to enter a guilty plea, thereby permitting the Government to avoid preparing for trial, and hereby moves the Court to grant an additional one-level reduction if the adjusted offense level is 16 or greater.

11. <u>Possibility of Sentence Reduction</u>. The U.S. Attorney's Office will decide

whether to file a motion for departure or reduction of sentence pursuant to USSG § 5K1.1 or Rule 35(b) of the Federal Rules of Criminal Procedure. The Defendant fully understands that such a motion may be made pursuant to law if, and only if, the Defendant fully cooperates with the United States and materially and substantially assists the Government in the investigation or prosecution of others. The determination of whether the Defendant has provided substantial assistance to the United States will be made in the sole discretion of the United States Attorney's Office, and in determining whether to file a USSG § 5K1.1 or Rule 35(b) motion the United States Attorney's Office will take into consideration the benefits already conferred upon the Defendant in paragraph 12 of this agreement. The Defendant fully understands that this paragraph is not a promise by the Government to file such a motion. The Defendant also understands that if such a motion is filed, the Court will have complete discretion to grant or deny it and, assuming it grants the motion, to determine how much of a sentence reduction the Defendant will receive based upon the nature and extent of his assistance. The Defendant acknowledges and agrees that he may not appeal the Court's exercise of its discretion in ruling on a motion for departure or reduction of sentence, or in determining how much of a departure or reduction is appropriate if it grants either or both such motions.

12. <u>Non-prosecution Agreement</u>. The U.S. Attorney's Office for the Western District of Michigan agrees, upon sentencing, to move to dismiss the remaining counts of the Indictment as they relate to Defendant. The U.S. Attorney's Offices for the Western District of Michigan, Eastern District of Michigan, and Southern District of Indiana agree to not bring additional criminal charges against the Defendant for his

13

conduct related to the ELF or other extremist environmental or animal-rights groups, organizations, or movements, provided that the conduct is disclosed to the Government by the Defendant or his attorney prior to the date that this agreement is executed. The Defendant shall remain subject to prosecution for any criminal activity that he has not disclosed to the Government prior to that date or that he might commit after that date.

13. <u>The Court Is Not a Party to This Agreement</u>. The Defendant understands that the Court is not a party to this agreement and is under no obligation to accept any recommendation by the U.S. Attorney's Office or the parties regarding the sentence to be imposed. The Defendant further understands that, even if the Court ignores such a recommendation or imposes any sentence up to the maximum established by statute, the Defendant cannot, for that reason, withdraw his guilty plea, and he will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that no one – not the prosecutor, the Defendant's attorney, or the Court – can make a binding prediction or promise regarding the sentence that the Defendant will receive, except that it will be within the statutory maximum.

14. <u>This Agreement Is Limited to the Parties</u>. This agreement is limited to the U.S. Attorney's Offices for the Western District of Michigan, the Eastern District of Michigan, and the Southern District of Indiana, and cannot bind any other federal, state or local prosecuting, administrative or regulatory authority. This agreement applies only to crimes committed by the Defendant.

15. <u>This Is the Complete Agreement</u>. This agreement has been entered into by both sides freely, knowingly, and voluntarily, and it incorporates the complete understanding between the parties. No other promises have been made, nor may any

additional agreements, understandings or conditions be entered into unless in a writing signed by all parties or on the record in open court.

CHARLES R. GROSS
United States Attorney
Western District of Michigan

_18 March 2008_
Date

_/s/ H.W. Frank_
HAGEN WALTER FRANK
Assistant United States Attorney
Western District of Michigan

_____
STEPHEN J. MURPHY, III (date)
United States Attorney
Eastern District of Michigan

_____
TIMOTHY M. MORRISON (date)
Acting United States Attorney
Southern District of Indiana

    I have read this agreement and carefully discussed every part of it with my attorneys. I understand the terms of this agreement, and I voluntarily agree to those terms. My attorneys have advised me of my rights, of possible defenses, of the sentencing provisions, and of the consequences of entering into this agreement. No promises or inducements have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorneys in this matter.

_3/19/08_
Date

_/s/_
FRANK BRIAN AMBROSE
Defendant

    I am FRANK BRIAN AMBROSE's attorney. I have carefully discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible defenses, of the sentencing provisions, and of the consequences of entering into this agreement. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

_3-19-2008_
Date

_/s/ Michael J. Brady_
MICHAEL J. BRADY, Esq.
Attorney for Defendant

15

additional agreements, understandings or conditions be entered into unless in a writing signed by all parties or on the record in open court.

CHARLES R. GROSS
United States Attorney
Western District of Michigan

_____  _____
Date                          HAGEN WALTER FRANK
                              Assistant United States Attorney
                              Western District of Michigan

*[signature]* for
_____  _____
STEPHEN J. MURPHY, III (date)  TIMOTHY M. MORRISON (date)
United States Attorney         Acting United States Attorney
Eastern District of Michigan   Southern District of Indiana

    I have read this agreement and carefully discussed every part of it with my attorneys. I understand the terms of this agreement, and I voluntarily agree to those terms. My attorneys have advised me of my rights, of possible defenses, of the sentencing provisions, and of the consequences of entering into this agreement. No promises or inducements have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorneys in this matter.

3/19/08                        *[signature]*
_____  _____
Date                          FRANK BRIAN AMBROSE
                              Defendant

    I am FRANK BRIAN AMBROSE's attorney. I have carefully discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible defenses, of the sentencing provisions, and of the consequences of entering into this agreement. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

3/19/2008                      *[signature]*
_____  _____
Date                          MICHAEL J. BRADY, Esq.
                              Attorney for Defendant

15

additional agreements, understandings or conditions be entered into unless in a writing signed by all parties or on the record in open court.

CHARLES R. GROSS
United States Attorney
Western District of Michigan

_____
Date

_____
HAGEN WALTER FRANK
Assistant United States Attorney
Western District of Michigan

_____
STEPHEN J. MURPHY, III (date)
United States Attorney
Eastern District of Michigan

*[signature]* 3/17/08
TIMOTHY M. MORRISON (date)
Acting United States Attorney
Southern District of Indiana

I have read this agreement and carefully discussed every part of it with my attorneys. I understand the terms of this agreement, and I voluntarily agree to those terms. My attorneys have advised me of my rights, of possible defenses, of the sentencing provisions, and of the consequences of entering into this agreement. No promises or inducements have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorneys in this matter.

3/19/08
Date

*[signature]*
FRANK BRIAN AMBROSE
Defendant

I am FRANK BRIAN AMBROSE's attorney. I have carefully discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible defenses, of the sentencing provisions, and of the consequences of entering into this agreement. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

3-19-2008
Date

*[signature]*
MICHAEL J. BRADY, Esq.
Attorney for Defendant

15