```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE WESTERN DISTRICT OF MICHIGAN

 3                        SOUTHERN DIVISION

 4

 5   UNITED STATES OF AMERICA,

 6             Plaintiff,

 7      v.                          CASE NO:  1:08-CR-47-02

 8   FRANK BRIAN AMBROSE,

 9             Defendant.

10   _____/

11                        * * * *

12                    SENTENCING HEARING

13                        * * * *

14

15   BEFORE:   THE HONORABLE PAUL L. MALONEY
                    United States District Judge
16                  Kalamazoo, Michigan
                    October 20, 2008
17
     APPEARANCES:
18
     APPEARING ON BEHALF OF THE PLAINTIFF:
19
             HAGEN W. FRANK
20           Assistant United States Attorney
             P.O. Box 208
21           Grand Rapids, Michigan  49501-0208

22   APPEARING ON BEHALF OF THE DEFENDANT:

23           MICHAEL JOSEPH BRADY
             24684 Hathaway Street, 2nd Floor
24           Farmington Hills, Michigan  48335-1547

25
```

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

```
 1                    Kalamazoo, Michigan

 2                    October 20, 2008

 3                    at approximately 10:09 a.m.

 4                         PROCEEDINGS

 5        THE COURT:  This is 08-47; the United States of

 6   America vs. Frank Brian Ambrose.  This matter is before the

 7   Court for sentencing.

 8        The record should reflect that Assistant United

 9   States Attorney Hagen Frank is here on behalf of the

10   government.  Attorney Michael Brady is here on behalf of the

11   defendant.  The defendant is present in person.

12        The presentence report has been prepared.  The Court

13   has been advised that there are no objections to the

14   presentence report.

15        The Court's file reflects that on March 20 of the

16   year 2008, the defendant pled guilty to Count One of the

17   Indictment, conspiracy to commit arson, contrary to 18 U.S.

18   Code 844(f)(1).  This plea was accepted by the Court on April 7

19   of the year 2008.  Under the circumstances of this case, I

20   accept the plea agreement.

21        Mr. Brady, have you had an ample opportunity, sir, of

22   reviewing the presentence report with your client?

23        MR. BRADY:  Yes, I have, your Honor.

24        THE COURT:  And is it true that there are no

25   objections to the report?
```

```
 1              MR. BRADY:  It is true.

 2              THE COURT:  The Court has calculated the guideline

 3    range at 240 months, that is the statutory maximum.  The

 4    guidelines as calculated call for Offense Level 36, Criminal

 5    History Category VI, which ordinarily would have resulted in a

 6    guideline range of 324 to 405, but of course, the statutory

 7    maximum in this case is 20 years, so that becomes the guideline

 8    range.  Do you concur, sir?

 9              MR. BRADY:  Yes.

10              THE COURT:  Mr. Frank, same question.

11              MR. FRANK:  Yes, your Honor, we concur.

12              THE COURT:  Thank you.

13              Mr. Ambrose, you've had ample opportunity, sir, of

14    reviewing the presentence report with your lawyer?

15              THE DEFENDANT:  Yes.

16              THE COURT:  Are you satisfied with your lawyer's work

17    on your behalf?

18              THE DEFENDANT:  Yes.

19              THE COURT:  Thank you, sir.

20              All right.  Mr. Frank, are you moving third level of

21    acceptance?

22              MR. FRANK:  We are, your Honor.

23              THE COURT:  The Court grants that motion.  That does

24    not change the advisory guideline range, the Court anticipated

25    the making of the motion and the Court's granting of it.
```

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

```
 1              Mr. Frank, contained in the presentence report, I
 2    believe at Paragraph 47, is a letter from Michael J. Kiley,
 3    Associate General Counsel of Michigan State University, I have
 4    read that.  Are there--  Is there anyone from the university or
 5    another person that might be categorized as a victim under the
 6    statute that wishes to address me?
 7              MR. FRANK:  No, your Honor.
 8              THE COURT:  All right.  Thank you.
 9              All right.  Mr. Brady, I would ordinarily call on the
10    government first, but I will allow you to go first, if you
11    wish, sir.
12              MR. BRADY:  No, I'm just standing there because you
13    called my name.  If you want the government to go first.
14              THE COURT:  All right.  Thank you.
15              Mr. Frank, on behalf of the government, sir.
16              MR. FRANK:  Thank you, your Honor.
17              If I could, I would like to address the government's
18    pending motion for a downward departure for substantial
19    assistance under Section 5K1.1 of the sentencing guidelines.
20              First off, your Honor, I think-- well, I know that
21    the government has moved for a pretty significant downward
22    departure based on assistance, but I would like the Court to
23    note-- I would like to note to the Court that my making this
24    motion was approved by our departure committee in the U.S.
25    Attorney's Office, which consists of three of the most tenured
```

1    senior Assistant U.S. Attorneys and management attorneys in our

2    office, and they approved my making this motion.  I think

3    that's significant because it indicates that at least in terms

4    of the corporate memory of the U.S. Attorney's Office what

5    defendant Frank Ambrose did to assist the government warrants a

6    5K that is as significant as what we are asking for.

7            And I think that above and beyond that, just looking

8    at the course of conduct as described in our motion shows that

9    this is a pretty unusual case when it comes to substantial

10   assistance, not just in terms of timeliness, but in terms of

11   the effort that the defendant put in to helping the FBI and

12   helping our office, not just in the Western District of

13   Michigan, but in other districts as well, solve some

14   investigations that weren't going anywhere.  Investigations of

15   very serious violent crime that weren't going anywhere.  He

16   brought those investigations back to life.  So it's not just

17   the timeliness here, and it's not just the importance of what

18   he did, it's the duration and the efforts he put into this.

19           Starting in summer of 2007 up to the present time,

20   Mr. Ambrose made himself available at all hours of the night to

21   the FBI, specifically in the person of lead agent Special Agent

22   James Shearer, and I know this for a fact, because sometimes I

23   would get texts in the middle of the night from Agent Shearer

24   relaying information that he had just got from Defendant

25   Ambrose.  I lost count of the times where Agent Shearer and I

1     were sitting around talking about this investigation or other

2     investigations and a question would come up and he would pick

3     up his phone, put in a call to Mr. Ambrose, and Mr. Ambrose

4     would either pick up immediately or within five to ten minutes

5     would call back with the answer to the question.

6          So the extent of his assistance to us was significant

7     in terms of time and effort he put into it, and also to some of

8     the risks he took, because there were times when he was at

9     these gatherings of ELF extremists wearing recording devices,

10    and the FBI was not at his elbow, because these people were

11    gathering in remote locations in natural settings and such, and

12    if something had happened, the FBI would not have been there

13    within a couple of minutes to stop it.  And so he took physical

14    risks on behalf of law enforcement also.

15         So based on the timeliness of what he did, the

16    duration, how long he was at it, the risks that he took, the

17    amount of travel he did, and the value of his cooperation to

18    federal law enforcement, the government submits that an eight

19    level departure from the guidelines starting at the level that

20    correlate to 240 months, we think a downward departure of eight

21    levels in this case is warranted.

22         Should I go ahead and speak to sentencing in

23    general?

24              THE COURT:  Absolutely.

25              MR. FRANK:  Your Honor, I think that this case is

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

```
 1   going to be, if I were sitting where you are sitting, your
 2   Honor, I think I would have a pretty tough task ahead of me.  I
 3   think this is going to be a difficult case to sentence.
 4   Because it was a difficult case for me to sort of decide, for
 5   me to come to a sense of what is appropriate, at least from the
 6   government's law enforcement perspective.  On the one hand, you
 7   have very serious misconduct here, not just MSU arson, which is
 8   as violent a crime as I've prosecuted.  Not just MSU arson, but
 9   all the other stuff the defendant stipulated to in the Eastern
10   District of Michigan and the Southern District of Indiana, so
11   you've got an extremely serious offense, and I would like to
12   talk a little bit about that angle of it first before I talk
13   about sort of the opposite pole, or at least what I see as the
14   opposite pole in this case.
15         The seriousness of the offense, as we describe in
16   sentencing memo, and as the Court probably knows just from
17   watching CNN, Earth Liberation Front and Animal Liberation
18   Front, there is very little sunlight-- daylight between the
19   two, they are very closely related.  These two movements have
20   become the primary domestic terrorism law enforcement concern
21   of the FBI.
22         As we cited in our sentencing memo, back in 2002, the
23   FBI assessed that ecoextremism and animal rights extremism had
24   become or overshadowed, had overtaken right wing extremism as
25   the primary domestic terrorism problem in this country.  At
```

```
 1   that time, in 2002, when the deputy director for domestic

 2   terrorism gave his testimony, the FBI was looking at tens of

 3   million dollars in damage.  At this point the damage these

 4   groups have done is over a hundred million dollars.  And it's

 5   not just economic loss, it's not just direct economic loss, but

 6   it's reasonable to infer the effect that it has on sort of

 7   those intangibles, the research, for example, they tried to

 8   destroy by torching Ag Hall at MSU.  I mean how do you quantify

 9   the cost of that?  Every time this group goes out and does

10   something, particularly when they go after the U.S. Forest

11   Service or MSU, I mean research activities.  I don't know how

12   you can put a price tag on that, because the kinds of

13   advancements that they are attacking, that these groups are

14   attacking are the kinds of advancements that can improve the

15   quality of life of the general populous, they can have a

16   dramatic economic impact, so it's hard to quantify the damage

17   that's done.

18           So it's not just economic, however, it's also the

19   fact that this is dangerous stuff.  Every time someone sets a

20   fire, they have to anticipate that even if there is nobody else

21   around, the fire department is going to show up.  Now,

22   sometimes-- I've never been a fire fighter, but I would think

23   they could just sit back and turn their hoses on and spray

24   water, I mean if it's in a luxury home under construction.  I

25   wouldn't think that's something that fire fighters would risk
```

```
 1   their lives going in to stop, maybe they just spray water on
 2   that.  But if you set fire to a historic building in the middle
 3   of a major university, you've got to figure fire fighters are
 4   going to show up and they are going to have to go in there and
 5   put that out.  And that was an extremely dangerous fire, and
 6   it's just pure luck that no fire fighter was injured or killed
 7   or no passerby was hit by the window that was blown out of the
 8   building.  So it's extremely dangerous.  And we will grant the
 9   defense that the defendant didn't mean for the fire to be that
10   bad.  I mean obviously he didn't want to cause an explosion in
11   the room that he was in.  But the fact is that when you let the
12   genie out of the bottle, so to speak, you are responsible for
13   everything that happens, and that was an extremely dangerous
14   fire, and all those other things he did.  So this is, in the
15   government's view, a very serious crime.
16           Then there is the other hand, the amends, everything
17   that he has done since 2007 to try and make it better.  I
18   recall note first off that he self corrected.  Defendant
19   Ambrose self corrected by 2004.  He knocked this stuff off, and
20   he got his life back on track.  And from the summer of 2007, as
21   Mr. Brady describes in his filing, the defendant just threw
22   himself into assisting the FBI.  And I've had-- I've spent a
23   lot of time talking with Frank Ambrose, probably three or four
24   days all total between preparing for grand jury and doing
25   proffers of information and all, and at least my sense is that
```

1  he is genuinely remorseful for all the things he did and that

2  his cooperation wasn't just damage control trying to limit his

3  sentence, but was a way to try to make right all of the things

4  he had done wrong.

5          So he has done all he could to help us.  He has done

6  all he could to make it right.  I think he is genuinely

7  regretful for all the things he did.  And I'll say I know for a

8  fact, I know for a fact that if he could have a do-over, if he

9  could go back to 1999, knowing what he knows now, being the

10 person he is now, I don't think he would do any of that stuff

11 again.  I genuinely I'm confident of that.  So I think that the

12 Court's difficulty here is two poles of this case, polling 180

13 degrees out in directly opposite directions, both of those

14 poles have, at least from the view down here, have an extremely

15 strong pull on the one hand there is the seriousness of the

16 offense that for all of the 3553 statutory sentencing reasons

17 counsel a harsh punishment.  And then on the other hand, there

18 is everything he has done since the time he self corrected, and

19 particularly since 2007 when Jim Shearer showed up and knocked

20 on his door.  Everything he's done pulls in the opposite

21 direction.

22          In all candor, I don't envy you, your Honor, today,

23 because I think you have got, again from my view, an extremely

24 difficult task in imposing a sentence in this case.

25          Now, the one thing that is in the defense sentencing

1    memo I would like to address is the idea that they pulled some
2    of these cases from the northwest, from the operation backfire
3    prosecutions, and point to an individual named Ferguson who got
4    sentenced to probation.  I went on PACER and I pulled up those
5    documents, the sentencing documents, the plea agreement, the
6    sentencing memorandum, they are publicly available.  The big
7    difference with Ferguson, the reason that case, that
8    sentencing, I think, is not much of a guiding light in this
9    case is, first off, he was sentenced only under the arson
10   guideline.  When he was sentenced, that 3A1.4 for terrorism, it
11   had just been passed.  He was sentenced under the 1995
12   guidelines, and at that time, that guideline that did exist was
13   only for international terrorism.  In 1996, that guideline was
14   changed by deleting international, so it just became a general
15   terrorism enhancement for when Ferguson was sentenced, he was
16   sentenced under a straight arson guideline of 2K1.4.  There was
17   no twelve-level 3A1.4 enhancement.  There was no automatic
18   Criminal History Category VI.  So this is an entirely different
19   playing field.
20          And the case of Mr. Ferguson out in the northwest
21   doesn't really, I think, help the Court very much.  And then
22   there was also the fact that that was a stipulated C1C
23   agreement, and this agreement is not a stipulated C1C
24   agreement.  And in there the government moved for twelve levels
25   for substantial assistance.  Based on my conversations with the

1   departure committee in my office in this case, twelve levels, I

2   don't know how they do it in the District of Oregon, but the

3   Western District of Michigan, that would-- that would be far,

4   far, far outside the norm.  Eight levels is a pretty big deal

5   for our office.

6           So in the short of it-- long and short of it is, the

7   Ferguson case I don't think is very helpful.  The bottom line

8   in this case is, your Honor, as I said, we think this is an

9   extremely-- it's going to be an extremely difficult case for

10  the Court to sentence.

11          I normally don't ask or make recommendations for

12  specific sentences, because I don't really think it's that

13  helpful to have an Assistant U.S. Attorney say what he or she

14  thinks is an appropriate sentence.  But I will say that, I

15  think, from our perspective in this case, perhaps the most

16  appropriate sentence lies somewhere between that mandatory

17  minimum and 120 months.  As we said in our sentencing memo,

18  under no circumstances is the government seeking 120 months

19  independent of what the Court does in the 5K motion, we are not

20  asking for more than 120 months.  And in all candor, if the

21  Court imposes a sentence somewhere around seven years, it would

22  be 84 months, I guess, I don't think the government would have

23  a basis to make a meritorious basis to appeal that.

24          THE COURT:  Well, the eight level reduction that you

25  are asking for in your 5K from the 240 guideline range would

```
 1   result in a guideline range of 100 to 125, correct?

 2            MR. FRANK:  I believe that's correct, your Honor.  If

 3   I could just have a moment.

 4            THE COURT:  Sure.

 5            (Pause in proceedings.)

 6            MR. FRANK:  Yes, your Honor.

 7            THE COURT:  All right.  Thank you.

 8            Thank you, Mr. Frank.

 9            Mr. Brady.

10            MR. BRADY:  Your Honor, I think that Mr. Frank in

11   making the seven year suggestion was contemplating the Court

12   going to the bottom of the guidelines following the granting of

13   his 5K motion, and he has signalled in a footnote that there is

14   a legal basis for a variance below that should the Court be so

15   inclined.  And as I pointed out in my submission, you can go

16   wherever you want, they opened the door, and they know that.

17            I find myself in the, I suppose you would say,

18   enviable position, in following Mr. Frank, and I'm certainly

19   glad you didn't make me go first because I was standing in the

20   enviable position of being able to address the Court following

21   all that he said.  He spoke, you know, both ends, the stuff

22   which is more remote in time, the seriousness of the offense,

23   and more recent in time, the self correcting, and following

24   that, the extraordinary cooperation, which as the government

25   has always characterized, it went beyond just making, you know,
```

1    seeking a better deal, but was seeking to make amends in their

2    view of my client's mental involvement in that.  I think that's

3    all true.

4           Let me make reference to the fact, and I know the

5    Court, because you told me, has read carefully all of the

6    letters submitted by family members, I think most of whom are

7    here today.  I don't know if anyone who wrote you a letter

8    didn't make the trip.  I suspect one or two failed to make the

9    trip, but we have got either 13 or 14 people who have shown up,

10   all of them willing to address the Court, and I told them that

11   most people, certainly in state court, show up and their mother

12   isn't even there.  And just the fact of their presence and

13   their concern in addition to the letters, I think, is, I hope,

14   useful to the Court.

15          THE COURT:  Well, Mr. Brady, as I've indicated to

16   you, I have read all of the letters in detail.

17          MR. BRADY:  Your Honor, one thing that Mr. Hagen

18   Frank said in his speaking as a prosecutor about the

19   seriousness of the offense, the possibilities that are inherent

20   in any fire, and the fact that that makes things serious,

21   potentially serious beyond intent.  He acknowledges that there

22   was no intent for there to be an explosion, they were in the

23   room.

24          Something which I heard from Mr. Hagen Frank that I

25   hadn't heard from my client that I would like to share with the

1  Court, and I think I didn't hear it because it was in grand

2  jury, and I was sitting outside in the antechambers doing

3  crosswords or something, was that unlike at least one other

4  defendant who is going to come before you in this case,

5  Mr. Ambrose "didn't like," wouldn't use any sort of device, any

6  sort of timer, any sort of thing which will cause a fire or

7  conflagration or explosion or anything after he had left the

8  scene, because he didn't know who would come on the scene.  He

9  can't control who will be there when it goes off was the

10 language I wrote down, if you use a device.  I think that that

11 is-- and again, you have to take responsibility for what you do

12 and the possible consequences, but some-- it ought to make the

13 Court feel a little bit better if you are moving towards

14 leniency, to note the intent and the lack of, you know, the

15 concern for the person who isn't there now and might come to be

16 there in using something, and that was the only-- that was the

17 only thing of that sort.

18      As you know, my client was involved in the

19 above-the-line legal ecology movement working for a save the

20 forest type of foundation and when he first met his wife to

21 be.  It was after that that he drove the first spike into a

22 tree, and that is what brought him into ELF.  I can anticipate

23 the conversation, you've been doing all that thing, you want to

24 save forests, you know, she might have said you think that, you

25 know, that's sissy stuff trying to influence legislators going

1    to do something you put a tree-- a spike in a tree and you tell

2    them you did it, they are not going to cut that tree down,

3    you've inoculated it, you've made it safe.  So this was the--

4    you'll indulge me if I say baby step across the line, which was

5    associated with the relationship that he went to, and then

6    before the government knocked on his door, had seen better of

7    and self corrected, and the self correction involved stopping

8    any involvement in these activities before he had separated

9    from Marie Mason, and then separating and divorcing, and then

10    leaving it all entirely behind.  And he even left his

11    above-the-line stuff.  He couldn't be involved in that

12    anymore.  It had all been, in a sense, I think, spoiled for

13    him, because he knew what he had done and it was a wrong thing

14    he felt bad about, and here I think I'm just echoing what Hagen

15    Frank said about his understanding, his belief of my client.

16        So I think we have here, your Honor, someone who is

17    genuinely, as he stands before you now, a good person, who has

18    gone over the line, and we know the history of that, and it's a

19    shame that he did it.  It's to his credit that he doped all

20    that out and figured it out and left it behind after he was

21    able to see it more clearly in ways that he sees it even more

22    clearly now.  And after leaving it behind, he self corrected

23    with the government.

24        I think, your Honor, that Mr. Frank says that it's--

25    it might well be a difficult decision for the Court because you

1   are going to be drawn, as he suggested, in two directions.

2   There is all kinds of reason for the man who is here before you

3   and his recent activity as described to be as gentle as you

4   can, and yet Hagen Frank suggests the rules governing

5   sentencing suggest you got to look at the seriousness although

6   back in time.

7           I think, your Honor, that and I address those

8   guidelines, I think there is no utility in incarceration in

9   terms of reforming the defendant.  I think that is an

10  accomplished fact.  I think that the basis for any

11  incarceration, and your hands are tied, has to be strictly

12  punishment, and that is one of the legitimate reasons for

13  imposing an incarcerative sentence, which indeed you have to

14  do.  But I think, your Honor, that-- and I think I started by

15  saying I didn't have to say much because what went before me

16  and what I submitted, but I would urge the Court in this case

17  to acknowledge the man who is before you who is not just a

18  criminal, who has done things for the government to soften his

19  offense, but who self corrected and then did things way above

20  just helping the government to make personal amends.  And you

21  could reward that here today, and I would urge you to do so by

22  giving us a variance below the deviation.

23          And there is one other point I want to make, I hope I

24  don't lose it.  The Ferguson case in Oregon that Hagen Frank

25  was talking about, and he was explaining how the guidelines

1    have changed since then, how the-- how the box into which you

2    find yourself was changed by 911 because they took the word

3    international out and so it falls into there.  But and I think

4    I spent some time suggesting that philosophically and in other

5    ways Frank's activities, the way the statute is written and now

6    interpreted, can merit the terrorism slot, but that to the

7    extent it does, it overstates the actual offense under all the

8    circumstances and what brings him within that that didn't bring

9    Ron Ferguson within that puts it at the bottom end, so there

10   is, I think, a basis for a variance because of the overstating

11   of the actual offense by the guideline in that case.  And I

12   think I will quit there, your Honor.

13          Thank you very much.

14          THE COURT:  Thank you, Mr. Brady.

15          Mr. Ambrose, is there anything you wish to say on

16   your own behalf, sir?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  You may proceed as you wish.

19          THE DEFENDANT:  Your Honor, as I stand before you

20   here, I want to make a statement about my past actions.  I want

21   to apologize to all of the victims, to MSU, to the other people

22   that I hurt with my actions.  I feel tremendous remorse that I

23   took such foolish actions and used such-- and used these people

24   and institutions to try to make a point.  I had no right to do

25   so.  I'm sorry for any loss, any fear, any other negative

1    effects my actions brought upon my victims.

2           Secondly here, I want to apologize to my family who

3    is sitting behind me here today.  They raised me well.  I

4    should have been able to resist the people and ideas that

5    helped lead me astray.  I take full responsibility for my

6    actions, you know, but it's I should have been able to see that

7    I was doing wrong at the time and, you know, I'm sorry about

8    that.  I let them down and I embarrassed them.

9           At the same time, I want to thank my family as well,

10   without their love and support I would not be able to get

11   through this time.

12          I want to right the wrongs as well, you know, more

13   than just address them and say I'm sorry for them.  I want to

14   right the wrongs that I committed.  I have been working with

15   the FBI as been noted, and other law enforcement.  I want to

16   continue to do that.  I want them to be able to pick my brain

17   and do what is necessary and use what is necessary to help stop

18   these actions from happening in the future and also go back and

19   be able to get the people who did them in the past.  So

20   hopefully I can continue to do that.

21          I also would like to figure out a way to do outreach

22   to young people who are, you know, are standing where I was

23   standing back in the late '90s.  To talk to them about this

24   dangers of extremism, to talk about the forces that are out

25   there that glamorize or romanticize the violent behavior and

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    make it seem like it's a legitimate way to act.

2         I would use my life as an example as to what happens

3    when you act out of line like I did.  And, you know, I would

4    explain that, you know, your fleeting thoughts of youth, they

5    pass, and when the reality of supporting yourself sets in, all

6    you realize all you've left and built for yourself is a life on

7    the run, either a run from your past or a run from the law, so

8    and also you actually will realize that you've hurt the causes

9    that you've tried to help.  You know, you may have thought for

10   a second you were trying to save a forest somewhere, but in

11   reality all you've done is taken a giant step backwards in any

12   sort of stride you'll be pushing for that.  So I could also use

13   my skills, I'm a tradesman now.  I do hardwood floors.  I can

14   work for Habitat For Humanity, other charities to help repay

15   some debts to society.  They are always in need of people, you

16   know, skilled people to be able to conduct their projects

17   wherever they are.  That would be something that I want to

18   throw out there.

19        I wish I could take all that I did back.  I've

20   changed significantly since those years where I did the bad

21   things.  By working with the FBI, as far as change, you know,

22   I've eliminated basically all my former friends.  I'm talking

23   about my legitimate friends.  I'm not concerned about the

24   people that I did the bad things with, whatever happens,

25   happens.  But just upstanding, normal citizens, they cared

1    about an issue or that, people that were there by your side if

2    you needed something, I'm a pariah to them now, they don't want

3    to talk to me, even if I wanted to, they wouldn't talk to me.

4    I only have my family and a few coworkers to fall back onto in

5    times of need, as I've noted already.

6            So once again, you know, I want to say-- express my

7    intense remorse for what I did.  And my sorrow that I hurt the

8    people and institutions and businesses.  My old life feels like

9    an alien memory form.  I don't know how to describe it, other

10   than that.  It's like somehow I can remember all these things I

11   did, but I didn't-- and I can understand, I guess, how someone

12   would get there, but I can't actually believe that I was ever

13   so foolish to do that myself.

14           So finally here, I want to ask the Court for leniency

15   in the sentencing matter.  I would like to be able to remain a

16   productive part of society and repay my victims.

17           And finally, once again, I can't say I'm sorry

18   enough, so I'll say it again, I'm sorry to all of my victims.

19           THE COURT:  Thank you, sir.

20           Mr. Frank, anything further?

21           MR. FRANK:  No, your Honor.  Well, I guess just one

22   slight correction on something Mr. Brady said.  The

23   modifications to the terrorism guidelines were the result of

24   Oklahoma City, not 9/11.

25           Nothing else, your Honor.


          KATHLEEN S. THOMAS, U.S. District Court Reporter
        410 West Michigan Avenue, Kalamazoo, Michigan  49007
                        (269)385-3050

1          THE COURT:  Mr. Brady, anything further?

2          MR. BRADY:  Your Honor, I didn't mention before we

3    talked about it in chambers, I was making a request of the

4    Court to make a recommendation to the Department--  the Bureau

5    of Prisons rather, and I believe you indicated that you would

6    recommend central Pennsylvania as a geographical focus, and

7    there are several prisons there, and that would assist family

8    members in visiting, and I appreciate that.

9          Secondly, and I addressed this in chambers, and I

10   understand that I'm uphill, but I want to say it here.  I was

11   urging the Court to consider self reporting.  There is

12   precedent for it.  I understand that there is a governing

13   statute which you are able to act counter to without

14   repercussion, but that you may find controlling, I think, your

15   Honor, that there would be nothing adverse to the government,

16   it's continuing to work with Mr. Ambrose, if you would see fit

17   to allow self reporting in this case, and I would again ask you

18   to consider doing that.

19         And beyond that, I won't repeat anything I said

20   before.

21         THE COURT:  All right.  Thank you.

22         All right.  It is the Court's duty to impose a

23   sentence sufficient, but not greater than necessary to comply

24   with the purposes of sentencing set forth in 18 U.S. Code

25   3553(a).


              KATHLEEN S. THOMAS, U.S. District Court Reporter
           410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1          The Court recognizes that the guidelines are advisory

2     to the Court.  The Court has taken the guidelines into account

3     as an initial benchmark or starting point when sentencing in

4     this case.  The Court must make an individualized assessment

5     based on the facts presented.  I recognize that the guideline

6     range is one of the array of factors warranting consideration.

7          I want to state for the record that I have thoroughly

8     reviewed the government's sentencing memorandum, the

9     defendant's sentencing memorandum with the many letters of

10    individuals who know Mr. Ambrose, especially family members,

11    attached to that memorandum.  I have read them all and

12    thoroughly considered them.  I have the government's 5K motion

13    for an eight-level departure, which in the Court's short tenure

14    on the federal bench of approximately 14 months, is a highly

15    extraordinary motion to make.  Normally the 5K motions are in

16    the range of two or three levels, sometimes slightly higher,

17    but the Court has, for the first time, seen a variance or-- I'm

18    sorry, a departure request of eight levels, which I have

19    alluded to, if you start from the 240 month guideline range,

20    results in an advisory guideline range of 100 to 125.

21          I recognize that Mr. Brady has made an argument that

22    given the dynamics of the guidelines as it relates to the

23    statutory maximum of the offense to which the defendant has

24    pled guilty, that Mr. Ambrose may be entitled to additional

25    downward movement of his advisory guideline range.  I'll deal

1    with that in a moment.  And I also recognize that I have the

2    defendant's request for a motion for a variance beyond the

3    eight-level motion that the government has made.

4         The 3553 factors are the nature and circumstances of

5    the offense, and the history and characteristics of the

6    defendant.  The sentence must reflect the seriousness of the

7    offense, promote respect for law, provide just punishment for

8    the offense, afford adequate deterrence to criminal conduct,

9    protect the public from further crimes of the defendant,

10   provide the defendant with needed medical, educational and/or

11   correctional treatment.  The need to avoid unwarranted

12   sentencing disparity among similarly situated defendants, and

13   the kinds of sentences available to the Court.

14        On the last point, only a prison sentence is

15   appropriate in this case, starting with the reason that this is

16   a statute for which a mandatory minimum is required by action

17   of Congress.  But the facts and circumstances here in the

18   totality call for a prison sentence.

19        On the second point, regarding unwarranted sentencing

20   disparity, the defendant has directed me to some sentence

21   dispositions in the District of Oregon.  For the reasons that

22   Mr. Frank has outlined on the record, the Court does not

23   believe that those sentences are appropriately contrasted or

24   compared with the circumstances in this case.  In addition to

25   that, I would note from a report of the United States

1    Sentencing Commission issued in June of 2007 on departures

2    downward on this guideline outside the operation of 5K yields

3    only about a four percent downward departure across the

4    country.  So I have considered the defendant's argument in

5    regard to the reference to Oregon, but I don't feel that it's

6    attendant to the case here.

7            The defendant's also made an argument regarding the

8    application of 3A1.4, which is the, for lack of a better term,

9    terrorism adjustment, to the guideline.

10           I also note for the record, Footnote 3 of the

11   government's memorandum.

12           The defense argument is really twofold; number one,

13   the facts and circumstances of this case don't merit a

14   twelve-level enhancement.  The Court disagrees with that.  This

15   crime is a very very serious offense committed on the campus of

16   a major institution, not only in the State of Michigan, but

17   also an educational institution that has a worldwide reputation

18   for agricultural research.  In addition to that, setting a fire

19   in an educational building in the dead of night, it seems to

20   me, is the essence of an attempt to terrorize individuals.  So

21   the Court does not believe that the twelve-level enhancement

22   overstates the seriousness of the offense.  So for that reason,

23   the Court rejects the defendant's argument in that regard.

24           Also referenced is the fact that the acceptance

25   adjustment for which Mr. Ambrose is duly entitled, the

 1   three-level reduction, occurs before the application of the 5G

 2   chapter of the guidelines, and the argument goes that as a

 3   result Mr. Ambrose has not had the benefit of his acceptance.

 4   I recognize the holding in the Rodriguez case, which grants the

 5   Court discretion, under these circumstances, to go below and

 6   give the defendant additional credit.  I decline to do so.  I

 7   think the plea agreement in this case, as well as the 5K

 8   motion, adequately capture Mr. Ambrose's acceptance of

 9   responsibility, and what I will say is substantial cooperation

10   with the government.

11          As far as the 3553 factors are concerned; the nature

12   and circumstances of this offense, and the history and the

13   characteristics of the defendant.  I think the essence of the

14   seriousness of the offense, not only the Congressional mandate

15   of a five-year mandatory minimum, but also the letter from the

16   Assistant General Counsel of Michigan State University places

17   in context the seriousness of this matter, and I read in part,

18   "When people come onto MSU's open campus under cover of dark

19   to destroy and to put untold numbers of people at risk, the

20   resulting harm is inflicted on the entire academic community.

21   The affront is profound in nature, and the impact is truly

22   severe, both for the institution and for the whole academic

23   enterprise."  Elsewhere in the letter, Mr. Kiley, for the

24   record, K-i-l-e-y, notes the nature of the research that was

25   going on in this particular part of the ag building on MSU and

1  the purpose of the research was to confront worldwide hunger,

2  to come up with a strain of potatoes that were resistent to the

3  Tubar, T-u-b-a-r, moth.  And it was designed to enhance potato

4  production so that those in Africa and other third world

5  countries can combat hunger, and malnutrition in their

6  countries.  It is that effort that was attacked on December

7  31st of the year 1999 on the MSU campus.  The Court views the

8  offense to be extremely serious.  An open campus designed to

9  foster learning and research in this vital area is attacked by

10 Mr. Ambrose and his co-defendants on New Years Eve 1999.  So

11 the Court views the offense to be extremely serious.

12       The sentence in this case must promote respect for

13 law.  The institutions of higher learning in our country need

14 to be protected, and the Court's responsibility is to fashion a

15 sentence that protects as best we can those institutions of

16 higher learning and send a signal to those who would disrupt

17 that mission, that they will be dealt with severely if they

18 come into federal court.

19       Now, having said all of that, as Mr. Frank has

20 already alluded to and Mr. Brady alluded to in their arguments

21 here this morning, the other extreme on this case, and indeed

22 the seriousness of the offense is very extreme indeed in the

23 Court's judgment.  The other extreme on this case is the

24 defendant himself and what he has done since this dastardly

25 crime back in 1999.  First, he has no prior record.  He is a

```
 1    graduate of a big ten institution.  Everyone agrees that as of

 2    2004, the defendant's self corrected and stopped his activities

 3    on behalf of ELF-- for purposes of the record, E-L-F--  and

 4    that had largely self corrected as of 2004 when in the summer

 5    of 2007, the defendant was approach by agents of the FBI

 6    regarding the MSU fire.

 7         I accept the defendant's genuine remorse for the

 8    commission of this offense.  I believe him when he says that he

 9    is genuinely remorseful.  And I also recognize that he has done

10    substantial-- he has made substantial efforts to assist the

11    government since he was originally approached by agents of the

12    FBI.

13         I'm also, however, mindful of the fact that the

14    instant offense is one of eleven, that through the use of fire

15    and other means gripped communities, whether it be academic,

16    residential or commercial, and gripped them in fear as a result

17    of the incidents.

18         I also recognize the defendant has been fully

19    employed for a substantial period of time.  He has a trade in

20    the hardwood flooring industry.  And certainly moving forward,

21    after the defendant completes his sentence, he has-- he can be

22    a very productive member of society in the philanthropic ways

23    that he indicated during the course of his allocution, whether

24    it be for Habitat for Humanity or otherwise, and of course, in

25    addition to supporting his family.
```

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

```
 1              I also fully recognize that the defendant has

 2    substantial family support.  It is not often that a defendant

 3    in a federal criminal case has two rows of family members

 4    seated in the courtroom.  I want to thank you for coming here

 5    today.  It's a substantial show of support for Mr. Ambrose.  He

 6    has already indicated that he is thankful for that support.

 7    And it's clear to the court that the defendant has a very

 8    substantial reservoir of family support, not only because of

 9    the numbers of individuals that are here, but also one of the

10    letters that I received, I think, says more than anything

11    else.  The letter was from Dr. Joseph Ambrose, who is a medical

12    professional, and he said this:

13              "My father passed away twelve years ago and left a

14    huge ache in all of our hearts.  He was a man of high principal

15    and impeccable character.  He left very little in the way of

16    worldly wealth, but left us something much more valuable.  He

17    left us his name that was unsoiled.  We have tried so hard to

18    pass our name on to our children as unsoiled as we received it,

19    and have had every expectation that our children would do

20    likewise."

21              Dr. Ambrose then goes on and makes some references to

22    his mother, the defendant's grandmother, and also indicates

23    that he feels that the defendant in this case can become a

24    productive member of society.  So it's clear to the Court that

25    the defendant has substantial family support moving forward.
```

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

     1              I have dealt with the nature and circumstances of the

     2       offense, which is detailed in Paragraph 47.  The history and

     3       characteristics of the defendant.  I've also opined regarding

     4       the seriousness of the offense.  That the sentence must promote

     5       respect for law, and just punishment, obviously, for the

     6       defendant, the seriousness of the offense, mitigated however,

     7       by the defendant's substantial cooperation.

     8              Deterrence is also important, and there are two

     9       levels of deterrence, one is specific, the other general.  Only

    10       one is operative here, in the Court's judgment, and that is

    11       general deterrence of others.  I'm satisfied that Mr. Ambrose

    12       has self corrected, that he does not pose a risk of further

    13       criminal wrongdoing once he is released from his term of

    14       imprisonment.  But the Court also has to be mindful of general

    15       deterrence in fashioning a sentence here that is deterring

    16       others who may contemplate similar activities in the future.

    17              Now, the substantial cooperation of the defendant is

    18       outlined in the government's 5K motion as presented by Mr.

    19       Frank today.  It's been extensive.  It's been effective in the

    20       prosecution of other wrongdoers, including his co-defendants in

    21       this particular case, who are set for sentencing in February of

    22       2009.  And the Court has fully assessed his cooperation to date

    23       in fashioning a sentence here.

    24              I would note that without the statutory cap of 240

    25       months, and I recognize I'm dealing with the statutory cap, if

                    KATHLEEN S. THOMAS, U.S. District Court Reporter
                 410 West Michigan Avenue, Kalamazoo, Michigan  49007
                                  (269)385-3050

1  Mr. Ambrose had not cooperated with the government and had been

2  convicted of all the offenses to which he could have been

3  convicted, if the government had been able to prove beyond a

4  reasonable doubt, at the lowest end of his advisory guidelines,

5  it would have been greater than 25 years, and as high as 33.

6  But I start with the statutory cap of 240 months.  The

7  government has filed a 5K motion for eight levels.  I find that

8  motion to be meritorious, and the Court does intend to depart

9  down eight levels, which leaves me with an advisory guideline

10  range of 100 to 125 months.  And for all the reasons that I've

11  set forth on the record here today, the Court intends to impose

12  a sentence within that range.

13        The defendant's motion for a variance below that

14  range is denied.  I think under all the facts and

15  circumstances, the advisory range contained after the

16  government's 5K motion is appropriate.  So for all those

17  reasons, it's the sentence of the Court that the defendant,

18  Frank Brian Ambrose, be committed to the custody of the Bureau

19  of Prisons to be imprisoned for a term of 108 months.

20        Upon release from imprisonment, the defendant shall

21  be placed on supervised release for a term of life.  Within 72

22  hours of release from custody of the Bureau of Prisons, the

23  defendant shall report in person to the probation office in the

24  district to which the defendant is released.

25        While on supervised release, the defendant shall

1  comply with the mandatory and standard conditions of

2  supervision, including DNA collection, drug testing is

3  suspended.  He is not to possess any firearms, destructive

4  devices or dangerous weapons.

5        Additionally, the defendant shall comply with the

6  following special conditions of supervision:

7        The defendant shall provide the probation officer

8  with access to any requested financial information.

9        He shall not apply for nor enter into any loan or

10  other credit transaction without the approval of his probation

11  officer.

12        The defendant will submit any personal computer owned

13  or controlled by the defendant to a search conducted by his

14  probation officer or designee, at a reasonable time and in a

15  reasonable manner without prior notice or search warrant to

16  determine if the defendant added, removed, updated or

17  reinstalled, repaired or otherwise modified the hardware or

18  software on the computer or hid encrypted files or data

19  inconsistent with the conditions of supervision.

20        Further, the defendant will provide all

21  computer-related billing records, including telephone, cable,

22  internet, satellite, and the like, as requested by his

23  probation officer.  Refusal to submit to such search is a

24  violation of the conditions of supervised release.  The

25  defendant will warn anyone with whom he shares residence that

1    the premises may be subject to search pursuant to this

2    condition.

3             The special assessment of $100 is ordered and is due

4    immediately.

5             In light of the substantial restitution burden the

6    defendant has, the Court finds the defendant does not have the

7    able to pay a fine.  Accordingly, the fine is waived.

8             I waive interest on the restitution.

9             Restitution is ordered as follows:

10            To Deer Park construction site in Bloomington,

11   Indiana, $95,000.  Vandalism of logging equipment in

12   Bloomington, $55,000.  Sterling Woods Development in

13   Bloomington, $200,000.  Crider and Crider Equipment of

14   Bloomington, $500,000.  Morgan-Monroe State Park in

15   Bloomington, $5,500.  Yellowwood State Forest, Bloomington,

16   Indiana, $1,600.  Rose Acre Farm in North Vernon, Indiana,

17   $100,000.  Martin State Park in Shoals, S-h-o-a-l-s, Indiana,

18   $55,000.  Mystic Forest in Superior Township, Michigan, in the

19   Eastern District of Michigan, $1 million.  And Willow Ridge in

20   Macomb County, $1 million.  The total loss due to this

21   conspiracy becomes $3,021,536.

22            The Court recognizes the government has reported that

23   some of the businesses victimized by Mr. Ambrose and his

24   co-defendants have since gone out of business.

25            Any payment made that is not a payment in full shall

 1  be divided proportionately among the persons named.  The

 2  defendant's restitution shall not be affected by any

 3  restitution payments that may be made by other defendants in

 4  this case.  Restitution payments shall be made to the United

 5  States District Court Clerk for distribution to the victims.

 6  The defendant shall apply all monies received from income tax

 7  refunds, lottery winnings, judgments, and any other anticipated

 8  or unexpected financial gains to any outstanding court-ordered

 9  financial obligation.

10         The Court also recommends the defendant be

11  incarcerated in central Pennsylvania, which is nearest to his

12  family members for purposes of his family visiting him in the

13  institution.

14         Mr. Frank, are there any counts to be dismissed,

15  sir?

16         MR. FRANK:  Yes, your Honor.  The government moves to

17  dismiss Counts Two through Four.

18         THE COURT:  Those counts are dismissed.

19         Mr. Frank, any legal objections to the sentence

20  imposed?

21         MR. FRANK:  No, sir.

22         THE COURT:  All right.  Mr. Frank, what is your--

23  recognizing that this is a statutory case, what is your

24  position on voluntary surrender, sir?

25         MR. FRANK:  Your Honor, doing a strict legal

```
 1   analysis, I don't think that, unless the defense can put on
 2   some evidence that establishes that there are exceptional
 3   circumstances, I mean I think they could probably show clear
 4   and convincing that there is no flight risk or danger, but they
 5   still have to show exceptional reasons for the statutory
 6   exception under Section 3541(c), that would establish that
 7   immediate detention is unwarranted in this case, and I just
 8   don't see those facts are there right now.
 9             THE COURT:  Are there law enforcement reasons why in
10   the interim before he is ordered to report that would mitigate
11   towards allowing him to voluntary surrender?
12             MR. FRANK:  There are some, your Honor.  If I could
13   have a minute with counsel and the agent?
14             THE COURT:  Sure.
15             (Pause in proceedings.)
16             MR. FRANK:  Your Honor, there's a couple things he's
17   got on that he is scheduled to do.
18             THE COURT:  Are those referenced in the submissions?
19             MR. FRANK:  No, they are not.
20             MR. BRADY:  No.  One is, but the others are not.
21   There are some things Mr. Shearer knew about.
22             THE COURT:  Do you want to have a sidebar?
23             MR. FRANK:  Your Honor, there is nothing ongoing at
24   this point beyond what is referenced in the pleadings.
25             THE COURT:  All right.
```

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

 1          MR. FRANK:  I don't know if that answers the Court's

 2     questions.

 3          THE COURT:  It does.  All right.  Thank you.

 4          Mr. Brady.

 5          MR. BRADY:  I think that there is at least two

 6     matters, one in Quantico, which was not-- it's of use to the

 7     government, and you are aware of that one.  The other one is a

 8     criminal prosecution, which has more than one, if I understand

 9     it, necessary appearance or useful appearance by my client.

10     And I believe Mr. Shearer would find it useful if my client

11     were available and able to self report for purposes of that.

12          Mr. Frank has acknowledged that flight risk is, he

13     believes, not a factor here.  I think he has a concern that as

14     the numbers got higher than he asked for and we expected, that

15     might argue towards some danger of flight risk, but he doesn't

16     say so, and so I take him at his word, and I would ask you to

17     do that as well.  So I think your Honor, that there is no

18     danger of flight risk.  There is utility to the government.

19     There is utility to my client.  The Quantico thing, which is, I

20     think, of substantial use to the government in the education of

21     agents who are dealing with these issues across the country,

22     arguably he could be carried there for that, but the other

23     things are much more difficult and are likely to go away.  I

24     would urge the Court to consider these things and allow self

25     reporting.  I don't hear a strong objection from the

1  prosecution.  I think the government would be served as well as

2  my client.

3          THE COURT:  Mr. Frank, do you agree with that?

4          MR. FRANK:  I think it's a close call, your Honor.

5  As I said, I think that under the-- given his cooperation and

6  such, I think he could make the predicate showings to be

7  considered under 3145(c), but just looking from the technical

8  side, whether they are exceptional circumstances?  As I said,

9  there is, other than the things that are already in the papers

10 regarding going to Quantico and doing some training and some

11 appearances in the state case, we don't have anything going on

12 right now that--  If the Court would like a sidebar.

13         THE COURT:  Sure.

14         We need to get the white noise on.

15         (Sidebar conference.)

16         (Proceedings continued with a separate sealed record

17 at sidebar.)

18         (Sidebar conference concluded.)

19         (Pause in proceedings.)

20         THE COURT:  All right.  We are back on the record.

21         The Court will order the portion of the transcript

22 that was held at sidebar sealed.

23         Mr. Frank.

24         MR. FRANK:  Yes, your Honor.  Thank you.

25         During the sidebar after discussing with the Court,

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   with counsel and defense counsel, and after having a brief

2   conversation with defendant, the government thinks that there

3   are good reasons, and if the Court's judgment-- given the

4   Court's judgment those are exceptional reasons warranting

5   exception to the mandatory remand, the government has no

6   objection to that.

7           The defendant has a date with the FBI in Quantico to

8   do some training there, to be of assistance to the Bureau

9   generally.  He also has, although not a date certain, he is

10  expected to be in state court on the other side of the state

11  sometime in the next couple of months.  And I've just spoken

12  with the defendant just to stress that however bad he thinks it

13  is now, that if he did flee, we would get him, and when he

14  comes back, however bad he thinks it is now, it would be ten

15  times as bad.

16          THE COURT:  All right.  I concur, based on the

17  record, that there are exceptional circumstances.  I will allow

18  the defendant to voluntarily surrender.

19          Anything further before I give the defendant his

20  appellate rights, Mr. Frank?

21          MR. FRANK:  No, your Honor.  I did move to dismiss

22  Counts Two through Four.

23          THE COURT:  We covered that.

24          MR. FRANK:  Thank you.

25          THE COURT:  Mr. Brady, anything further?

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1          MR. BRADY:  No.

2          THE COURT:  Mr. Ambrose, I advise you, sir, you can

3     appeal your conviction if you believe that your guilty plea was

4     somehow unlawful or involuntary or if there is some other

5     fundamental defect in the proceeding not waived by your guilty

6     plea.

7          You also have a statutory right to appeal your

8     sentence under certain circumstances, particularly if you think

9     the sentence is contrary to law.  However, a defendant may

10    waive those rights as part of a plea agreement, and you have

11    entered into a plea agreement which waives some or all of your

12    rights to appeal the sentence itself.  Such waivers are

13    generally enforceable, but if you believe the waiver is

14    unenforceable, you can present that argument to the appellate

15    court.

16         You have the right to apply for leave to appeal in

17    forma pauperis if you are poor.  If you wish to do so, with a

18    few exceptions, you need to file the documents for which your

19    attorney will acknowledge receipt on your behalf, within ten

20    days of the entry of the judgment in this case.

21         If you file the documents, the Clerk of the Court

22    will prepare and file a notice of appeal upon your request.

23         Mr. Frank.

24         MR. FRANK:  Yes, your Honor, one last point.  Agent

25    Shearer just pointed out to me, we are not sure the Judge

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    included MSU in the restitution.

2              THE COURT:  That was my intention.

3              MR. FRANK:  Yes, your Honor.  I know the Court went

4    straight through the list of victims.

5              THE COURT:  I think the difference between the total

6    and what I outlined is what is owed MSU.

7              MR. FRANK:  Yes, sir, I just don't think--

8              THE COURT:  What is the MSU figures, just so we know?

9              MR. FRANK:  $1.1 million, your Honor.

10             THE COURT:  $1.1 million, so ordered.

11             MR. FRANK:  Thank you.

12             THE COURT:  All right.  Thank you.

13             Mr. Brady, anything further?

14             MR. BRADY:  Nothing further, your Honor.

15             THE COURT:  All right.  Thank you.

16             MR. BRADY:  We will receive notice about when and

17   where to report?

18             THE COURT:  The marshal service will take care of

19   that.

20             MR. BRADY:  Thank you, your Honor.

21             THE COURT:  Thank you.

22             Good luck to you, Mr. Ambrose.

23             THE DEFENDANT:    Thank you.

24             MR. BRADY:  Is there--  Excuse me, is there a--   We

25   have to pay a hundred dollars.  Is there a clerk's office in

1   this building?

2           THE COURT:  You can work that out.  Yes.

3           MR. BRADY:  Okay.

4           THE COURT:  You can take care of that.

5           Thank you.

6           COURT CLERK:  All rise.

7           Court is in recess.

8           (At 11:20 a.m., proceedings were concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


              KATHLEEN S. THOMAS, U.S. District Court Reporter
           410 West Michigan Avenue, Kalamazoo, Michigan  49007
                          (269)385-3050

1

2

3

4

5                        REPORTER'S CERTIFICATE

6

7

8          I, Kathleen S. Thomas, Official Court Reporter for

9     the United States District Court for the Western District

10    of Michigan, appointed pursuant to the provisions of Title

11    28, United States Code, Section 753, do hereby certify

12    that the foregoing is a true and correct transcript of

13    proceedings had in the within-entitled and numbered cause

14    on the date hereinbefore set forth; and I do further

15    certify that the foregoing transcript has been prepared by

16    me or under my direction.

17

18

19

20

21                        _____

22                        Kathleen S. Thomas, CSR-1300, RPR
                           U.S. District Court Reporter
23                        410 West Michigan
                           Kalamazoo, Michigan   49007
24

25


              KATHLEEN S. THOMAS, U.S. District Court Reporter
         410 West Michigan Avenue, Kalamazoo, Michigan   49007
                           (269)385-3050